UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION (JACKSON)

COPIAH BANK, N.A.                                                                    PLAINTIFF

VS.                                                      CIVIL ACTION NO. 3:12-cv-27-FKB

FEDERAL INSURANCE COMPANY, INC.
JOHN DOES 1-10; JOHN DOE CORPORATIONS 1-10,
and JOHN DOE ENTITIES 1-10                                              DEFENDANTS

MEMORANDUM OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [78] filed by

Defendant Federal Insurance Company, Inc. ("Federal") and opposed by Plaintiff Copiah Bank

("Bank").  The parties have consented to have a United States Magistrate Judge conduct all

proceedings in this case and order the entry of final judgment, and the District Judge has entered

a Reference Order [22].  For the reasons explained in this Memorandum Opinion and Order, the

Court hereby grants Federal's Motion for Summary Judgment.  Accordingly, a separate judgment

dismissing this case with prejudice will be entered.  Fed. R. Civ. P. 58.

I.  FACTS AND PROCEDURAL HISTORY

A.  Background

This case is part of the legal fallout from a bank fraud and money laundering scheme

operated by Jon Christopher Evans and his brother, Charles Evans, from January 2003 to

October 2009, and prosecuted in this Court.  Info. [1], United States v. Evans and Evans, 3:10-

cr-118-DPJ-FKB.[1]  According to the Information, Jon Christopher Evans and Charles Evans

---

[1] "A court may also take judicial notice of documents in the public record. . . ."  R2
Investments, LDC v. Phillips, 401 F.3d 638, 639-640 n. 2 (5th Cir. 2005).  Plaintiff also refers to
Charles Evans's  Plea Agreement and the Information in its Memorandum of Law in Opposition
to the Motion for Summary Judgment [82] at 2.

"devised a plan to fraudulently secure mortgage proceeds from financial institutions by misrepresenting to such financial institutions the legal descriptions, title and lien history, and ownership of real estate the Defendants were intending to purchase" in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 1956(h).   Info. [1] ¶ 7. In essence, the brothers conspired to set up a "Ponzi" scheme whereby they, inter alia, secured loans from banks using the same parcels of property as collateral on multiple occasions and used loan proceeds from later transactions to pay on loans owed from earlier transactions.  Tr. Restitution Hr'g [96] at 30-31.

As part of the scheme, Charles Evans, an attorney, provided financial lending institutions with certificates of title which failed to disclose, misrepresented, and/or otherwise concealed encumbrances and liens on numerous properties given as collateral for many of these loans. Info. [1] ¶¶ 12, 13.  Relying on these title certificates issued by Charles Evans, the lending institutions "believ[ed] [they] had received a priority security interest in said property as collateral for the respective loan when in fact [they] had not." Id.

According to a sentencing transcript, the scheme involved over $80 million in loans from almost fifty banks to almost thirty different shell corporations set up and controlled by the Evans brothers. Tr. [93] at 41. Over a period of six years, actual losses to banks from the scheme totaled in excess of $20 million. Id. at 47.

As a result of the scheme, the brothers pleaded guilty to bank fraud and conspiracy to commit money laundering.  The Court sentenced Charles Evans to a 240-month term of imprisonment, followed by a period of supervised release.  J. [66]. The Court sentenced Jon Christopher Evans to 168 months of imprisonment, followed by a period of supervised release. J. [67].  The Court also ordered forfeiture of assets totaling over $18 million, Tr. Restitution Hr'g

[96] at 42, and ordered each defendant to pay restitution to affected institutions. Js. [66, 67]. Although Copiah Bank is listed in the Information as one of many banks victimized by the scheme, the Bank is not listed as an institution for which the Court awarded restitution. Id.

### B. Claims

In the present case, Plaintiff Copiah Bank alleges that it suffered a $100,545.00 loss due to the actions of Charles Evans and Jon Christopher Evans.  In its Third Amended Complaint, the Bank asserts that Charles Evans provided it with a Certificate of Title, dated April 2, 2009, to a parcel of real property located in Rankin County, Mississippi, which "indicated that the real property had no prior liens or outstanding deeds of trust filed for record." Third Am. Compl. [46] ¶ 6.  Copiah Bank alleges that "[i]n good faith reliance on the assurances of . . . Charles Evans, Plaintiff extended credit to Jon Christopher Evans" in the form of a line of credit in the amount of $100,545.00.  Id. ¶ 7. The Bank alleges that, on or about September 23, 2009, it learned of the Evans brothers' scheme and, at that time, retained a third party to perform a title search on the subject property. Id. ¶¶ 8, 9. The third party title search revealed that "two other persons or entities had priority interests in the subject property." Id. ¶ 9.

At the time of the subject loan to Jon Christopher Evans, Copiah Bank was the assured under a security bond issued by Federal. The Bank asserts that Jon Christopher Evans failed "to repay the funds obtained pursuant to the line of credit" and seeks to recover $100,545.00 on the bond. Id. ¶ 10. The Bank also seeks attorneys' fees and punitive damages, alleging that Federal's denial of its claim constitutes bad faith breach of contract.  Id. ¶ 29.

Copiah Bank contends that three provisions of the bond afford coverage for its loss. Those provisions include: Insuring Clause 1. - Dishonesty; Insuring Clause 2.A. - On Premises;

and Insuring Clause 5. - Extended Forgery. See id. ¶¶ 11, 16, 19.

Insuring Clause 1. - Dishonesty covers:

1.    A. Employee

Loss resulting directly from dishonest acts, other than stated in
1.B. below, of any Employee, committed alone or in collusion with
others, except with a director or trustee of the ASSURED who is
not an Employee, which result in improper personal financial gain
to either such Employee or other natural person acting in collusion
with such Employee, or which were committed with the
intent to cause the ASSURED to sustain such loss.

B. Trade Or Loan

Loss resulting directly from dishonest acts of any Employee,
committed  alone  or  in collusion with others, except with a
director or trustee of the ASSURED who is not an Employee,
which arise totally or partially from:

(1) any Trade, or
(2) any Loan,

provided, however, the ASSURED shall first establish that the loss
was directly caused by dishonest acts of any Employee which
result in improper personal financial gain to such Employee and
which were committed with the intent to cause the ASSURED to
sustain such loss.

Notwithstanding the foregoing, when a loss is covered under this
INSURING CLAUSE 1.B., and the Employee was acting in
collusion with others and intended to receive improper personal
financial gain, but said Employee failed to derive such improper
personal financial gain, such loss will nevertheless be covered
under this INSURING CLAUSE as it [sic] the Employee had
obtained such improper personal financial gain provided that the
ASSURED establishes that the Employee intended to receive such
improper personal financial gain.

For the purpose of this INSURING CLAUSE, improper personal
financial gain shall not include salary, salary increases,
commissions, fees, bonuses, promotions, awards, profit sharing,
incentive plans, pensions, or other emoluments.

-4-

Bond [78-1] at 4.

      Insuring Clause 2.A. - On Premises, provides coverage for :

2.      A.  Loss of Property resulting directly from:

      (1)      robbery, burglary, misplacement, mysterious unexplainable disappearance, damage or destruction, or

      (2)      false pretenses, or common law or statutory larceny, committed by a natural person while on the premises of the ASSURED,

      while the Property is lodged or deposited at premises located anywhere.

<u>Id.</u>

      Insuring Clause 5. - Extended Forgery covers:

5.      Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:

      A.      acquired, sold or delivered, or given value, extended credit or assumed liability, in reliance on any original:

      (1)      Certificated Security,
      (2)      deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,
      (3)      Certificate of Origin or Title,
      (4)      Document of Title,
      (5)      Evidence of Debt,
      (6)      corporate, partnership or personal Guarantee,
      (7)      Security Agreement, or
      (8)      Instruction,
      which
      a.  bears a Forgery, or
      b.  Is fraudulently altered, or
      c.  is lost or stolen, or

      B.      guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, or endorsement upon on in connection

                with any item listed above, which pass or purport to
                pass title to such items, or

C.        acquired, sold or delivered, or given value, extended credit
                or assumed liability in reliance on any item listed in A.(1)
                through A.(4) above which is a Counterfeit Original.

Id. at 6.

### C.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine if the "'evidence is sufficient to permit a reasonable factfinder to return a verdict for the nonmoving party.'" Lemoine v. New Horizons Ranch and Center, 174 F.3d 629, 633 (5th Cir. 1999)(quoting Colston v. Barnhart, 146 F.3d 282, 284 (5th Cir.), cert. denied, 119 S.Ct. 618 (1998)).  Issues of fact are material if  "resolution of the issues might affect the outcome of the suit under governing law." Lemoine, 174 F.3d at 633.

Under Rule 56, the movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "When considering summary judgment evidence, [the court] must view 'all facts and inferences . . . in the light most favorable to the nonmoving party[,] . . . [and] must 'not weigh the evidence or evaluate the credibility of witnesses.'" Boudreaux v. Swift Transp. Co., Inc., 402 F.3d 536, 540 (5th Cir. 2005)(citations omitted). In fact, the court "'resolve[s] factual controversies in favor of the nonmoving party, . . . ." Id.

If the movant meets its burden, "the nonmovant must go beyond the pleadings and

designate specific facts showing that there is a genuine issue for trial." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc). Addressing the nonmoving party's responsibility at this juncture, the Fifth Circuit has stated that

> [t]his burden is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.* <u>See Lujan [v. National Wildlife Federation</u>, 497 U.S. 871, 888 (1990)](resolving actual disputes of material facts in favor of nonmoving party "is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint. . . .").

<u>Id.</u> (emphasis in original)(some citations omitted).

In the present case, although the parties draw differing legal conclusions from the facts, there is no genuine dispute as to any material fact. Thus, this is a case that is amenable to summary judgment. With the above standards in mind, the Court turns to the parties' arguments.

## II.  ARGUMENT AND AUTHORITIES

### A.  Insuring Clause 1. - Dishonesty

Federal makes three arguments, contending that Insuring Clause 1 - Dishonesty does not afford Copiah Bank coverage: "1) Charles Evans was not its employee, 2) he did not have the specific intent to cause the Bank a loss and 3) there is no indication he received improper financial gain from the subject transaction." Def.'s Mem. Summ. J. [79] at 1. Because the Court finds the issue of whether Charles Evans was the Bank's "Employee," as defined by the bond, to be dispositive of the coverage issue under Insuring Clause 1. - Dishonesty, the Court will not address Federal's other two arguments.

The relevant definition of "Employee" contained in the bond and relied on by Copiah

Bank provides:

> Definitions   1.   As used in this Bond:
>
>               X.   Employee means:
>
>                    . . .
>
>                    (4)   an attorney retained by the ASSURED and an employee
>                          of such attorney while either is performing legal services
>                          for the ASSURED.

Bond [78-1] at 18, 21.

### 1. Facts Relevant To Whether Charles Evans Was Copiah Bank's "Employee"

Copiah Bank points to various facts to support its claim that Charles Evans was its "Employee," as defined in the bond. To meet the bond's definition of "Employee," the Bank must show that it "retained" Charles Evans. In its attempt to show that it "retained" Charles Evans, Copiah Bank relies on the deposition testimony of Timothy A. Courtney[2] and George R. Marx, two bank officers during the relevant time period.  Courtney was the lending officer and Senior Vice President who handled the subject transaction in 2009.  Marx was the President and CEO of Copiah Bank during the relevant portion of 2009.

In his deposition, Courtney testified that at his initial meeting with Jon Christopher Evans in April 2009, Evans "asked if he could use [his brother, Charles Evans] to provide the title work" on the Rankin County property, referred to as "Channing Place." Courtney Depo. [78-3] at 4.[3]  The Channing Place property served as the collateral for the $100,545.00 loan at issue in

---

[2] Copiah Bank also submitted an affidavit from Timothy A. Courtney, which the Court has considered.

[3] In 2004, Copiah Bank had also loaned J.C.E. Construction (an entity formed by the Evans brothers, Jon Christopher Evans Depo. [82-9] at 14) approximately $300,000 to purchase

this case.  Id.  Courtney responded that it "was okay because [Charles Evans] had done previous work for [Copiah Bank],[4] and [Charles Evans] was an authorized agent for Valley Title," a title insurance company in Mississippi.  Id. Courtney testified that he never met Charles Evans personally and that he talked to him on the phone only one time in relation to the transaction.  Id. at 5. This one phone conversation between Courtney and Charles Evans did not occur until after he received the certificate of title from Evans.  Id.  During that one phone call, Courtney relayed to Charles Evans that when Jon Christopher Evans signed the deed of trust, Courtney would then send the deed of trust and a recording fee to Charles Evans for him to record the deed of trust at the courthouse.  Id.  Courtney also testified that, during the same phone call, he asked Charles Evans to send him the recorded deed of trust and a title opinion showing that the deed of trust had been recorded.  Id.

Courtney further testified that, about thirty to sixty days after the initial phone call, he called Charles Evans to follow-up on his request because he had not received a copy of the filed deed of trust or title certificate showing that it had been recorded.  Id.  He did not speak with Charles Evans at the time, but was assured by someone in Charles Evans's office that they "were working on it."  Id.  Courtney confirmed that he never received a copy of the filed deed of trust

---

property in Madison County, referred to as the "Highland Colony" property, and Charles Evans provided the title work for that transaction. Marx Depo. [78-4] at 8-9.  In 2009, Jon Christopher Evans renewed J.C.E. Construction's Highland Colony loan with Copiah Bank. Courtney Depo. [78-3] at 3-5. During the course of renewing J.C.E. Construction's Highland Colony loan in 2009, Jon Christopher Evans also sought to obtain funds personally from Copiah Bank using the Channing Place property as collateral. Id. [78-3] at 3-5.

[4]As stated *supra* n. 3, the "previous work" Courtney referenced was the title work that Charles Evans had performed for the Highland Colony loan. Courtney testified that these two instances were, to his knowledge, the only times that Charles Evans had done work on Copiah Bank loans. Courtney Depo. [78-3] at 4.

or title certificate he requested from Charles Evans.  Id. at 5-6.

As for Charles Evans's fee, Courtney testified that Charles Evans told him that he "and his brother would work that out."  Id. at 6.  Courtney further stated that such an arrangement "is not uncommon.  We have appraisals, surveys, title searches and all paid outside of closing.  It's the customer's responsibility."  Id.  Courtney admitted that the bank never paid a fee to Charles Evans for the certificate of title.  Id.  Nevertheless, Courtney contended that Charles Evans was an employee of the bank because he gave the bank a title certificate on which it relied, and Courtney asserted, "I consider that to be working for us, just like an appraiser, a surveyor, we're under the assumption that he's employed by us."  Id.  Courtney also testified that he considered the one phone call between him and Charles Evans to constitute a "verbal contract" or "verbal agreement" between Charles Evans and Copiah Bank.  Id.

Marx's testimony echoed certain points made by Courtney.  Marx, the President and CEO of Copiah Bank, asserted that the Bank made the claim because "someone that we engaged to do work for us did it dishonestly." Marx Depo. [78-4] at 5.  Nevertheless, Marx admitted that Charles Evans never received a paycheck from the Bank related to the subject transaction and that the Bank neither had a retainer agreement with Charles Evans nor paid Charles Evans a retainer.  Id. at 7.  Marx voiced an understanding of "the true sense of retain" by stating that "we [the Bank] only have a retainer with one law firm," and it was not Charles Evans.  Id.  He testified, however, that Charles Evans was on the "approved list" of attorneys to do title work on Copiah Bank loans.  Id.  But, Marx admitted that Charles Evans had never done any title work on Copiah Bank loans, except for the Highland Colony title work, see n. 3 *supra*, and the Channing Place title certificate at issue in this case. Id. at 9. Finally, Marx testified that he had

never met or talked with Charles Evans. Id. at 12.

The Evans brothers were also deposed. Charles Evans's testimony fails to enlighten the Court because he pleaded the protections of the Fifth Amendment to all questions posed during his deposition. Charles Evans Depo. [82-4]. While Jon Christopher Evans's deposition is, at best, self-serving, his testimony does shed light on the vast scope and mechanics of the "Ponzi" scheme operated by the brothers from 2003 to 2009.  With respect to his dealings with banks on the loans comprising the scheme, Jon Christopher Evans testified that he "would suggest using Charles Evans as the title attorney," Charles Evans was his attorney, and, to his knowledge, Charles Evans was never paid attorney's fees. Jon Christopher Evans Depo. [82-9] at 30.[5]

In the Rule 30(b)(6) deposition of Federal's representative, the company maintained, inter alia, its position that Charles Evans was not an employee of the Bank because he was not retained by the Bank, that there is no evidence that the Evans brothers intended to defraud the Bank in this particular transaction, and that there is no evidence that the brothers reaped a financial gain from this particular transaction. Federal Depo. [82-6]. Federal's representative also reiterated that in the Bank's initial September 2009 claim letter, the Bank "repeatedly" referred to Charles Evans as the attorney representing Jon Christopher Evans. Id. [82-6] at 5.

Turning to the Bank's initial claim letter to Federal, dated September 30, 2009, the Bank refers to Charles Evans as "the attorney and representative of Jon Christopher Evans" several times. Letter [78-6]. In fact, a review of the three-page letter reveals that the Bank referred to Charles Evans as Jon Christopher Evans's "attorney" or "representative" ten (10) times. Id.  In

---

[5] The Government's "Intended Loss Amount and Restitution" chart lists over one hundred thirty (138) transactions for which the Evans brothers received loans.  Pl.'s Resp. Mot. Summ. J. [82-9] at 37-45.

no part of the letter does the Bank refer to or characterize Charles Evans as its attorney, nor does

it allege in the letter that it had "retained" Charles Evans.

>   2.  Parties' Arguments On Whether Charles Evans Was Copiah Bank's "Employee"

Federal relies on Moultrie National Bank v. Travelers Indem. Co., 275 F.2d 903 (5th Cir.

1960), to support its argument that Charles Evans does not meet the definition of "Employee"

under the bond. In Moultrie, an attorney signed a title certificate directed to Moultrie National

Bank. Moultrie, 275 F.2d at 903. The title certificate "stated that he had checked the records" on

a described tract of real property and "certified that . . . J. L. Gardner was seized of the fee

simple title of the said tract and that same was clear of liens, . . . except the security deed by J. L.

Gardner to Moultrie National Bank." Id. at 903-04. However, according to the bank, "the title to

the land was not in Gardner, as certified to by the attorney . . . ; [and] there was no record of his

having such title in the Land Records which the attorney certified he had checked." Id. at 904.

Seeking to recover on a bond, Moultrie National Bank filed suit. As part of the basis of

its claim, the bank argued that "the attorney and his act in certifying title to the land . . . was

covered by the provisions of the fidelity bond, he being within the definition of an 'attorney

retained by the insured to perform legal services for the insured' . . . ." Id. On appeal, the Fifth

Circuit rejected the bank's argument and stated:

>   we are of the opinion that as matter of law a construction of the bond which
>   would, under the undisputed facts of this case, bring [the attorney who issued the
>   title certificate] within the definition of 'an attorney retained by the bank' is
>   supported by neither reason nor authority. . . ."

Id. at 905.

Copiah Bank looks to Federal Insurance Company v. United Community Banks, Inc. and

United Community Bank (UCB), 2010 WL 3842359 (N.D. Ga. Sept. 27, 2010), to support its

-12-

position that Charles Evans meets the definition of "Employee" under the bond. Copiah Bank

points out that <u>UCB</u> involved the same insurance company and essentially the same bond

definition of "Employee" as the case <u>sub judice</u>. And in <u>UCB</u>, the district judge granted

summary judgment, specifically finding that the attorney in <u>UCB</u> met the "Employee" definition.

But, as shown below, <u>UCB</u> actually supports a finding in this case that Charles Evans does not

meet the bond definition of "Employee."

In <u>UCB</u>, the attorney at issue, Randy Carpenter, served as the closing attorney on the

majority of ninety (90) mortgage loans made by the bank, UCB, to individual borrowers over a

period of approximately two and a half years. <u>UCB</u>, 2010 WL 3842359 at *1. The loans

financed the purchase of lots in a particular residential development, the Village of Penland. <u>Id.</u>

As the closing attorney on these loans, Carpenter "prepared the HUD-1 Settlement Statements[,]

. . . issued title opinions[,] . . . obtained title insurance on UCB's behalf[,] . . . and disbursed loan

proceeds in conjunction with the closings." <u>Id.</u> at *2. Carpenter was also "the trustee on the

deeds of trust between the borrower and UCB." <u>Id.</u>

The Village of Penland project was a "'Ponzi-scheme'" which ultimately collapsed. <u>Id.</u>

After its collapse, UCB sought recovery under two financial institution bonds issued by Federal

for approximately $24 million in losses due to unpaid loans. <u>Id.</u> Specifically, UCB claimed that

Carpenter "was dishonest with UCB by certifying false HUD-1 Settlement Statements," which

resulted in the bank's losses.[6] <u>Id.</u> at *3.

On cross motions for summary judgment, the district court in <u>UCB</u> found as a matter of

_____

[6] Specifically, Carpenter certified in the HUD-1 Settlement Statements that the individual
buyers/borrowers "had paid the down payment when in fact they had not." <u>UCB</u>, 2010 WL
3842359 at *3.

law that Carpenter met the definition of "Employee" under the bonds.  Id. at *14. However, in

reaching its decision, the Court explicitly addressed Moultrie and explained its rationale for not

following the Fifth Circuit's holding in Moultrie.  Specifically, the Court stated:

> Plaintiff [Federal] points this Court to Moultrie National Bank v. Travelers
> Insurance Co., 275 F.2d 903 (5th Cir. 1960) for the proposition that a title search
> would not meet the definition of "an attorney retained by the bank." This Court
> does not disagree. However, that case is not persuasive as Carpenter did more
> than a simple title search. Carpenter approved the HUD-1 Settlement Statements,
> served as the trustee on the deeds of trust, received and disbursed the loan
> proceeds, and ultimately processed the closing documents.

UCB, at *13 n. 5.

Applying the UCB Court's rationale to the instant case compels the finding that Charles

Evans does not meet the definition of "Employee" under the bond.  It is undisputed in this case

that Evans provided nothing more than a title certificate in connection with the subject

$100,545.00 loan.  Unlike Carpenter, Evans did not approve any HUD-1 Settlement Statement,

did not serve as the trustee on Copiah Bank's deed of trust, did not receive or disburse the loan

proceeds, and did not process any closing documents for the loan at issue.  In fact, as Copiah

Bank admits, Evans did not prepare a settlement statement at all and did not perform a closing

for the subject loan transaction.  Pl.'s Mem. Resp. Summ. J. [83] at 13.  Far from supporting

Copiah Bank's position in this case, UCB actually supports that Evans does not meet the

definition of "Employee" in the Federal bond.

Copiah Bank's own September 30, 2009 claim letter also belies a finding in its favor.

Seeking recovery under the bond in this case, Copiah Bank has attempted to meet the bond

definition of "Employee" by arguing that it "retained" Evans.  However, Copiah Bank's claim

letter makes no such allegation.  In fact, Copiah Bank's claim letter refers to Charles Evans as

the "attorney" and/or "representative" of Jon Christopher Evans ten (10) times and never claims

that Charles Evans served as its attorney or that Copiah Bank "retained" him. Letter [78-6].

In an attempt to create an issue on whether it "retained" Charles Evans, Copiah Bank

argues that it asked Evans to file its deed of trust and provide it with a title certificate showing

that the deed of trust had been recorded. However, it is undisputed that Evans did neither.

Rather, the only legal service provided by Evans in relation to the subject loan and the only

source of "Dishonesty" on which the Bank bases its claim is Charles Evans's April 2, 2009 title

certificate, and the Bank has presented no evidence that it ever asked Charles Evans to prepare

that title certificate.

As shown above, Copiah Bank's loan officer, Timothy A. Courtney, testified that Jon

Christopher Evans "asked if *he* could use [his brother, Charles Evans] to provide the title work,"

and the Bank did not even talk to Charles Evans about the subject loan until *after* receiving

Evans's title certificate.  Although Courtney testified that, after he received the title certificate,

he asked Charles Evans to file the deed of trust and prepare another title certificate and that he

considered this to constitute a "verbal agreement" between Evans and the Bank, such an

agreement would, at most, be an agreement that Evans provide those services.  But, it is the

April 2, 2009 title certificate, not the non-existent title certificate Courtney requested, that is the

"dishonest act" on which the Bank's claim under the bond is based.  Copiah Bank has simply

failed to present facts showing that it "retained" Charles Evans to prepare the title certificate at

issue in this case or to create a genuine issue of material fact on this issue.[7]

---

[7] Copiah Bank urges this Court to apply the following Black's Law Dictionary definition
of "retain": "'to engage the services of an attorney or counselor to manage a specific matter or
action.'" Pl.'s Mem. Resp. Summ. J. [83] at 12-13. Applying this definition does not help the

This case may be likened to the fact scenario presented by the Comment to Rule 2.3 of the Mississippi Rules of Professional Conduct.

> **Definition**. *An evaluation may be performed at the client's direction but for the primary purpose of establishing information for the benefit of third parties; for example, an opinion concerning the title of property rendered at the behest of a vendor for the information of a prospective purchaser, or at the behest of a borrower for the information of a prospective lender.*

Miss. R. Prof. Conduct R. 2.3 cmt. (1987). Likewise, Charles Evans, "at the behest of a borrower" (his brother, Jon Christopher Evans), provided "an opinion concerning the title of property . . . for the information of a prospective lender," Copiah Bank.  As described in the Comment above, Jon Christopher Evans was Charles Evans's "client," just as Copiah Bank's claim letter declared Charles Evans to be the "attorney" and "representative" of Jon Christopher Evans.  As also described above, Copiah Bank was a "third part[y]" beneficiary of Charles Evans's legal, albeit incorrect, evaluation of the title to the Channing Place property.

In sum, Copiah Bank has failed to present a genuine issue of material fact as to whether Charles Evans was "an attorney retained by the ASSURED."  In fact, the undisputed material facts of this case show that Jon Christopher Evans, not Copiah Bank, retained Charles Evans to prepare the title certificate on which the Bank's claim is based.  Accordingly, the Court finds that Evans does not meet the bond's definition of "Employee," and Federal is entitled to judgment in its favor as a matter of law on Copiah Bank's claim for coverage under Insuring Clause 1.

<u>B. Insuring Clause 2.A. - On Premises</u>

Copiah Bank also makes a claim under the bond's Insuring Clause 2.A. - On Premises.

---

Bank's case. The "specific matter[s]" Courtney "engage[d]," or attempted to engage, Charles Evans to "manage" were the filing of the deed of trust and preparation of a title certificate showing that it had been filed, not the April 2, 2009 title certificate at issue in this case.

Insuring Clause 2.A. provides coverage for "[l]oss of [p]roperty resulting directly from, . . . [*inter alia*] false pretenses, or common law or statutory larceny, committed by a natural person while on the premises of the ASSURED, while the Property is lodged or deposited at premises located anywhere."  Bond [78-1] at 4.

Federal, however, argues that a specific provision of the bond excludes coverage under this clause for Copiah Bank's claim. According to Specific Exclusion 4, coverage is not available under Insuring Clause 2 for a "loss resulting from the complete or partial non-payment of or default on any **Loan** whether such **Loan** was procured in good faith or through trick, artifice, fraud or false pretenses. . . ." Id. [78-2] at 9 (emphasis in original).

While Copiah Bank points out that the subject loan transaction involved a line of credit and quibbles with whether it was a loan, "loan" for purposes of the bond is defined as follows: "**Loan** means all extensions of credit by the ASSURED and all transactions creating a creditor or lessor relationship in favor of the ASSURED, including all purchase and repurchase agreements, and all transactions by which the ASSURED assumes an existing creditor or lessor relationship." Id. [78-2] at 2. Based on the plain language of the bond,[8] the Court finds that Jon Christopher Evans's line of credit with Copiah Bank constitutes an "extension[] of credit by the ASSURED" and falls within the bond's definition of a "Loan."

Because Copiah Bank seeks recovery for "non-payment of or default on . . . [a] Loan,"

---

[8]"When the policy terms are plain and unambiguous, courts are to assign them their plain, ordinary meaning and enforce them as written. . . .'Many contracts are highly specific in defining terms to avoid the specter of ambiguity.'. . . . 'If a policy is not ambiguous, the court gives effect to its clear and unambiguous meaning.'" Henson v. U.S. Liab. Ins. Co., 2012 WL 3011754, *2 (N.D. Miss. Jul. 23, 2012)(citations omitted).

Specific Exclusion 4 applies, and Insuring Clause 2 affords Copiah Bank no coverage for its

claim.  Accordingly, Federal is entitled to summary judgment in its favor as a matter of law on

the Bank's claim under Insuring Clause 2.

### C.  Insuring Clause 5. - Extended Forgery

Finally, Federal asserts that Insuring Clause 5. - Extended Forgery provides no coverage

for Copiah Bank's claim. In its memorandum response to Federal's summary judgment motion,

Copiah Bank makes no argument or attempt to show that Insuring Clause 5 affords coverage for

its claim. In fact, the Bank essentially concedes that Insuring Clause 5 does not afford any

coverage for its claim. See Pl.'s Mem. Resp. Summ. J. [83] at 25, fn. 13.

Insuring Clause 5 - Extended Forgery, in part, provides coverage for: "Loss resulting

directly from the ASSURED having, in good faith, for its own account or the account of others .

. . extended credit . . . in reliance on . . . [a "(3) Certificate of Origin or Title"] which is a

Counterfeit Original." Bond [78-1] at 6. The bond defines "Certificate of Origin or Title" as a

"document issued by a manufacturer of personal property or a governmental agency evidencing

the ownership of the personal property and by which ownership is transferred." Id. [78-1] at 19.

"Counterfeit Original" is defined by the bond as "an imitation of an actual valid original which is

intended to deceive and be taken as the original." Id. [78-1] at 20.

The Court agrees that Insuring Clause 5. - Extended Forgery provides no coverage for

Copiah Bank's claim. In particular, the term  "Certificate of Origin or Title," as used in the bond,

refers to personal property rather than real property. Further, the Bank has failed to present any

evidence or argument to show that Charles Evans's April 2, 2009 Certificate of Title meets the

bond's definition of "Counterfeit Original." Accordingly, Federal is entitled to summary

judgment in its favor as a matter of law on Copiah Bank's claim under Insuring Clause 5.

### III.  CONCLUSION

Thus, for the reasons stated above, the Court finds that Federal is entitled to summary judgment.  Accordingly, Copiah Bank's claims are dismissed, and this action is dismissed with prejudice.  Pursuant to Rule 58 of the Federal Rules of Civil Procedure, a separate judgment will be entered.

SO ORDERED on the 15th day of January, 2014.

/s/ F. Keith Ball
UNITED STATES MAGISTRATE JUDGE